**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW HAMPSHIRE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:15-cr-00115-01-PB |
| | ) | |
| RYAN J. VALLEE | ) | |

**GOVERNMENT'S CONSOLIDATED (1) OBJECTION TO DEFENDANT'S MOTION**
**FOR DOWNWARD DEPARTURE AND VARIANCE and**
**(2) SENTENCING MEMORANDUM**

I.    **Introduction**

The government submits this consolidated (1) objection to defendant Ryan Vallee's

request for a downward departure and variance, and (2) sentencing memorandum.  As set for the

below, the government recommends a 96-month prison term for Vallee, a sexual cyber predator

who targeted dozens of teenaged girls in order to try to force them to engage in sexual activity,

namely, to take and give him sexually explicit photographs of themselves and to strip and

masturbate for him.  Several particularly disturbing aspects of Vallee's "sextortion" campaign

call for the recommended sentence.   As set forth in more detail below, Vallee victimized dozens

of girls who were 15 to18 years old[1] over the course of five years, continuing to commit these

crimes even after he was arrested and while under pretrial supervision.  With some, Vallee

interspersed his threats to hack, delete, and deface their accounts and to distribute their

compromising photographs with threats to have sexual intercourse with them.  To make his

threats even more coercive, Vallee made it clear to his victims that he was physically nearby and

knew detailed information about them, including where they lived and went to school.  Vallee

also tried to exert significant control over his victims.  He demanded that they perform specific

---

[1] In 2016, when Vallee renewed his hacking and sextortion against Jane Doe J and Jane Doe K, they were no longer teenagers, as they had been in 2012 when Vallee initially targeted them.

sex acts, photograph themselves in specified poses, and do so within designated time deadlines.

Vallee repeatedly carried out many of his threats. He distributed almost 100 nude and semi-nude

photographs depicting at least six identified Jane Doe victims to their classmates/friends

(including to almost a dozen other identified teenaged girls), family members, and, in at least one

instance, widely online. Almost a dozen of these photographs were extremely sexually graphic.

Perhaps most disturbing is the severe injury that Vallee inflicted on his victims, virtually

all of whom he personally knew and a few of whom considered him to be a friend. Indeed, at

least one actually confided in Vallee about what she was suffering through, not realizing that she

was seeking comfort and consolation from the very person who was tormenting her. Only time

will tell, but this betrayal of misplaced trust may be one of the most insidious and long lasting

psychological injuries he has inflicted. Many others also felt deeply violated, as if their stalker

had tried to sexually assault them. They were terrified: they feared not only for their privacy

and their relationships with their friends, family, and community, but also for their physical

safety. To make matters worse, these teenaged girls suffered in silence for prolonged periods of

time, unaware that they were crime victims and afraid to confide in one another, tell their

parents, or go to the police. At least two victims reported that they were extremely depressed

and had contemplated suicide. In short, without physically touching them, Vallee caused severe

emotional damage to the lives of these girls and their families. For some, it will no doubt take

years to recover. Many, particularly those whose photographs are still in the "ether," continue to

this day to be impacted by Vallee's remote sexual assaults.

The seriousness of Vallee's crimes, his history and characteristics, coupled with the

profound need to provide adequate specific deterrence to Vallee and general deterrence to other

would-be "sextortionists," compel the government's recommendation of a 96-month prison

sentence and, the government submits, preclude a downward variance or departure.  Moreover, the recommended sentence would be in line with other sentences meted out in this district and in other courts around the country that involved similar conduct.  It is also within the 87- to 102-month guideline's advisory range as calculated by the U.S. Probation Office in Vallee's Presentence Report.  (Revised PSI, filed January 23, 2017 ("PSI"), at ¶¶ 128, 148).

## II.    **Vallee's Plea Agreement**

On August 25, 2016, pursuant to a plea agreement, Vallee pled guilty to all 31-counts in the second superseding indictment.  In so doing, he admitted that all of the facts set forth in Paragraphs 1-79 of that indictment are true.   (Plea Agreement ¶¶ 1, 3).  That indictment contains a 21-page factual recitation and charges Vallee with 13 counts of interstate threats in violation of 18 U.S.C. § 875(d) (Counts 1-13), one count of computer fraud and abuse in violation of 18 U.S.C. § 1030(a)(2)(C), (c)(2)(B) (Count 14), eight counts of computer fraud and abuse in violation of 18 U.S.C. § 1030(a)(7) (Counts 15-22), eight counts of aggravated identity theft in violation of 18 U.S.C. § 1028A (Counts 23-30), and one count of cyberstalking in violation of 18 U.S.C. § 2261A(2)(B) (Count 31).  Count 31 relates to new, post-arrest criminal conduct that Vallee committed in February-March 2016, while he was under pretrial supervision and awaiting trial.  (Second Superseding Indictment, ¶¶ 73, 77-79, 84).

The plea agreement specifically leaves open the possibility that either federal or state authorities may prosecute Vallee in the future for committing child enticement, child endangerment, and/or child pornography offenses.  (Plea Agreement ¶ 10).  By way of background, in March 2016, when Vallee was re-arrested on new criminal charges while awaiting trial, federal investigators searched (pursuant to multiple search warrants) Vallee's hidden cell phone, which he possessed in violation of his conditions of release.  On it they found

not only photographs of several Jane Doe sextortion victims but also multiple images that appear to be child pornography, as well as evidence that Vallee had performed child-pornography related internet searches, discussed in more detail below.

The plea agreement contains a "binding" sentencing stipulation, pursuant to Fed. R. Crim. P. Rule 11(c)(1)(C), that includes a prison term of not fewer than four years and not greater than eight years.  (Plea Agreement ¶ 6).   For the reasons set forth below, the government urges the Court to reject the defendant's request for a 49% downward variance[2] and to instead impose the maximum permissible sentence, consistent with the binding plea, of eight years (96 months).

### III.    Vallee's Initial Criminal Conduct

As set forth in the indictment and the PSI, from 2011-2016, Vallee engaged in a prolonged computer hacking and cyberstalking campaign designed to force dozens of teenaged girls to create, and give to him, sexually explicit images of themselves.   He used a multi-pronged approach in his sextortion scheme, as described below.

### A.  Laying the Groundwork To Hide His Identity

Vallee, who knew virtually all of his victims and was friends with a few,[3] went to great lengths to hide his identity.  He concocted several fake online personas, including "Seth Williams," "Stephanie Williams," and "James McRow."  He then created bogus Facebook pages

---

[2] The defendant seeks a 48-month sentence, which would require a 49% reduction from the midpoint (94.5 months) of the advisory guideline range (87-102 months) as suggested at ¶¶ 128 & 148 of the PSI.

[3] For example, Jane Doe D considered Vallee to be a close friend at one point.  She had known him almost her entire life.  Vallee's mother used to babysit for her when she was younger. Likewise, Jane Doe E knew Vallee well and considered Vallee to be one of her close friends. They sat together at lunch and, indeed, she confided in him about her ordeal with "Seth."  Jane Doe H also considered Vallee a friend, sat with Vallee at lunch, and shared common friends with him.  Jane Doe G, like Jane Doe D, had been babysat by Vallee's mother when she was younger.

for each, posting phony profile photographs and personal details.  Vallee was careful to communicate with his victims electronically over the internet, rather than using a cell phone with a cell phone number that could be traced to him.  Beginning in 2010, Vallee downloaded onto his electronic devices internet-based text messaging apps such as "TextFree" and opened several accounts with each provider.  This would allow him to send text messages to his victims anonymously, making it appear that the messages were being sent from "spoofed" account numbers.  Later, in 2015 (while on supervised release and in direct violation of his conditions of release), Vallee acquired a web-enabled smart phone, which he kept hidden in a Nintendo DS portable gaming console case.  Vallee also made sure to access the internet using other people's and other establishments' wireless internet ("wifi") connections that could not be traced to him.  When he lived in Belmont and Laconia in 2011-2012, Vallee used his neighbor's and his mother's boyfriend's open "wifi" connections.  In 2016 (while on supervised release) Vallee used wifi connections belonging to another neighbor, a nearby restaurant, and the store where Vallee worked.

Vallee took these deliberate measures to hide his identity not only from his victims but also from law enforcement.  Indeed, when victims told "Seth" that they were going to report him to the police, Vallee mocked them, explaining that the police would never catch him because he used a "text free number" and "piggy backed" off other people's wifi connections.  He bragged that he had made sure that he was "untraceable" and that the police had tried, and failed, for over a year to catch him.  (Second Superseding Indictment ¶¶ 35, 74).

**B.  "Befriending" His Victims Online**

With his phony online personas in place, Vallee then began communicating online with his potential victims, typically via spoofed text and Facebook message.  Vallee initially tried to

strike up an online relationship with them.  He would compliment the girls, flirt with them, and ask them personal questions about themselves and their friends, presumably to help him later hack into their online accounts.  Vallee soon began asking, and then begging, the girls to send him topless and fully nude photographs of themselves.  He then relentlessly demanded that they give him naked photographs, promising to leave them alone only if they gave him the pictures.

### C.  Hacking Into and Defacing His Victims' Online Accounts

When Vallee's initial efforts failed to produce the desired photographs, Vallee then hacked into the girls' online accounts.  He primarily targeted their Facebook, Instagram, and e-mail accounts.  He accessed the accounts by correctly guessing the answers to the security questions and then re-set the account passwords.  Vallee then changed the passwords, took control over, and locked the girls out of their accounts.  With several, Vallee played a game of account "whack-a-mole."  Vallee would hack into the accounts, change the passwords, lock the girls out, and if the girls were able to somehow regain access to their accounts, Vallee would hack them again.  The cycle continued for months on end.  Several never regained control of their accounts.

Vallee also defaced several of the girls' hacked accounts.  He reset their Facebook profile photographs and posted sexually suggestive photographs of the victims on their pages.  He posed as his victims and posted sexually-oriented and humiliating comments on his victims' Facebook pages.  Vallee also impersonated his victims and sent harassing messages and sexually explicit photographs from their hacked accounts to other recipients.

With at least two identified victims, including Jane Doe F, Vallee hacked into their Amazon.com accounts, obtained their stored payment card data, and used that to purchase

vibrators, sexual lubricant, and pornographic videos.  He then had the vibrators and lubricant shipped to the girls' homes and apparently downloaded the videos for his personal gratification.

### D.  Obtaining and Distributing His Victims' Sexually Explicit Photographs

Vallee obtained and distributed approximately 80-90 nude and semi-nude photographs of at least six identified Jane Doe victims, as well as several of their friends and classmates.  The vast majority depicted the girls with their faces visible and their bodies shown either fully nude or topless.  In some, the girls were wearing a bra and/or underwear.  Some are extremely sexually graphic.  Ten are up-close photographs of female genitalia, eight of which are of an identified Jane Doe in the indictment.  She was 15 or 16 at the time the photographs were taken.  One is a photograph of another Jane Doe identified in the indictment, with her face visible, showing her exposed genitals.  She, too, was 15 or 16 when that photograph was taken.

The government does not know precisely how or when Vallee obtained many of his victims' photographs.  It appears that Vallee stole the vast majority of them from the online accounts that he hacked.  With others, Vallee successfully coerced and convinced a few victims into giving photographs to him.  One Jane Doe victim reluctantly texted "Seth" a fully nude photograph of herself, with her face shown, along with the telling tag line in her message, "have a nice life douchebag.  I hate you."  Another Jane Doe victim appears to have provided a semi-nude photograph of herself to "Seth" earlier during the initial "flirty" stage of his online communications with her.

Vallee then distributed some of the sexually explicit photographs to others, sending them back to the victim depicted in the photo, and in some instances also sending them to her friends, classmates, and family members.  All in all, Vallee sent fully and semi-nude photos depicting six identified Jane Doe victims to approximately a dozen other identified Jane Doe victims.  Vallee

sent a large tranche of approximately 75 photographs to Jane Doe I.  Those photographs included

sexually explicit photographs of other Jane Doe victims and other teenaged girls that she knew.

They included 10 graphic, up-close, photographs of female genitals and the "i hate you" fully

nude photograph described above.  (Second Superseding Indictment ¶¶ 69-70).  Vallee also sent

a photograph of another Jane Doe identified in the indictment, which shows her face and exposed

genitals, back to her.  He sent that same photograph to the victim's sister, as well as to two other

Jane Does.   (Second Superseding Indictment ¶¶ 23-25).  In at least one instance, Vallee

distributed the sexually explicit photographs widely across the internet.  He created a fake

Facebook profile of one Jane Doe victim, with one letter of her last name misspelled in the

account name.  He uploaded onto that Facebook page several sexually explicit photographs of

her, including the "i hate you" photograph that she had reluctantly sent him earlier.  Vallee then

proceeded to send "friend requests" to the victim's friends and family members to ensure that

they would see the sexually explicit photographs of her on her fake Facebook page.   (Second

Superseding Indictment ¶¶ 61-65).

### E.  Sending Threatening Communications to "Sextort" His Victims Into Providing Sexually Explicit Photographs of Themselves

With the backdrop described above, Vallee threatened to hack, delete, and deface his

victims' online accounts and to distribute his victims' compromising photographs, unless they

sent him sexually explicit photographs of themselves.  For example, Vallee hacked the Facebook

and e-mail accounts of one Jane Doe victim and stole a graphic, sexually explicit photograph of

her that showed her face and her exposed genitalia.  He then sent the sexually explicit

photograph back to the Jane Doe victim and threatened to re-set it as her Facebook profile

photograph unless she sent him additional sexually explicit photographs of herself to him.  He

threatened, "If I don't see your tits by ten everyone will see your pussy . . . Don't make me do

8

this . . . I hacked you once, I can hack you again."  (Second Superseding Indictment ¶¶ 22-24).
In another instance, Vallee hacked a Jane Doe victim's cell phone account and threatened to
"have your phone disconnected" unless she gave him a naked photograph of herself.  (Second
Superseding Indictment ¶¶ 74-75).

On a few occasions, Vallee also implicitly threatened to sexually assault his victims.  For
example, Vallee told Jane Doe C, "I'm going to have fun fucking you this summer," (Second
Superseding Indictment ¶ 41), and he told Jane Doe J, "I could always fuck you," and "I'm going
to fuck you on Halloween."   To make his threats even more coercive, Vallee made it clear to his
victims that he knew detailed personal information about them, including where they lived,
worked, went to school, their parents' names, their friend's names, and the like.

In tandem with these threats, Vallee made particularly detailed and controlling demands.
For example, he demanded that his victims perform specific sex acts and poses for him, and he
relished in giving his victims time deadlines.  For instance, with one Jane Doe victim, Vallee
demanded that she "finger herself," "put stuff between her boobs," stand in front of the mirror
and pose, and lay on her bed and "do things" for him.  Vallee demanded that Jane Doe H take
photographs in which she "fingered herself," "put oil on herself," and "sucked on a banana."
With other Jane Does, Vallee demanded, among other things, that they "show fucking tits," "one
full frontal nude," "get fucking naked on camera," and "show me your nipples."  He often
insisted that his victims send him the demanded photographs within specified time deadlines.
For example, Vallee warned, "you have 15 minutes," "you have ten minutes . . . Three minutes
left.  ONE MINUTE.  Time is up," and "if you don't send me a nude by 8 . . . "   (Second
Superseding Indictment ¶¶ 24, 30, 41).

Vallee sent these sextortionate communications to his victims persistently, often multiple times a day, during the school day and late at night, for months and in some cases years on end. Vallee was particularly obsessed with Jane Doe J, whom he targeted over the course of four years. Vallee tormented Jane Doe E and Jane Doe H (both of whom were personal friends of his) for almost two years, often texting them multiple times a day. He communicated with Jane Doe D for over a year. For a period of almost six months, he sent Jane Doe D frequent text messages almost daily.

Ultimately, as set forth in the indictment, from late 2011 until his initial arrest in October 2013 and again in February until his re-arrest in March 2016, Vallee victimized the Jane Does referenced in the indictment. Notably, although the indictment references conduct that began in 2011 and references 11 Jane Does, Vallee's online sexual menacing began even earlier[4] and involved twice as many identified victims (and likely many more).[5]

### F. Traumatizing His Victims

Vallee traumatized many of his victims and, indeed, left many emotionally injured even today, as set forth in detail in the victims' letters and interview memoranda and as anticipated in their in-person statements at the upcoming sentencing hearing. (See PSI ¶ 53-54 & fn 8-9, Victim Impact Letters from Jane Doe G, H, and other victim). The serious and lasting effects of Vallee's sextortion crimes cannot be understated. In essence, Vallee tried to force each girl to produce her own pornographic images for him. Even though the girls have not been physically

---

[4] Vallee's criminal conduct began in 2010. However, the charged conduct in the indictment is limited to conduct that took place after Vallee turned 18.

[5] In or about 2012-2013, approximately 24 victims came forward and formally filed complaints with their local police departments. Those complaints reference still other likely victims whose names are known to law enforcement but who have not yet come forward. Other records obtained in this investigation indicate that there are likely still other victims whose names are known to law enforcement but who have not yet come forward.

touched, for many, their trauma level is as severe as a hands-on offense.  The victims felt deeply

violated, as if Vallee were trying to sexually assault them.  Their fear and anxiety was immense.

They had no idea who their hacker/stalker was, why he had targeted them, how he had found

them, how he hacked into their accounts, or how he knew so much detailed personal information

about them.  Several feared for their physical safety.  They believed that their unknown stalker

was nearby and would sexually assault them at any moment.  Many would cry inconsolably and

were afraid to be left home alone.   One victim needed to be escorted whenever she walked

outside after dark.  Another had to sleep in her mother's bed every night for prolonged periods.

A few victims reported being extremely depressed and contemplating suicide.[6]

For the several girls whose sexually explicit images Vallee obtained, they were terrified

at the thought of the photos getting out.[7]   They faced the very real specter of having private,

---

[6] See PSI at ¶ 53-54 & fn 8-9.  As set forth in Jane Doe E's interview memorandum, she had
become extremely depressed and at one point she "was contemplating suicide over the
embarrassment."  Jane Doe E was a close personal friend of Vallee's and had confided in him
about her cyberstalker; yet Vallee, as "Seth," targeted her for years.  Another Jane Doe victim,
one of Vallee's youngest (born in 1996), came into the police station in tears and visibly
extremely upset.  She told the interviewing officer that she felt depressed, was having suicidal
thoughts, "cannot stop thinking that this unknown person is out there looking at her and watching
her" and "can't stop wondering if this person will start to attack her."  She stated that she feared
for her safety and was afraid to be home alone.  Her mother, who had accompanied her to the
police station, echoed these sentiments.  Her mother told officers that her daughter often called
her at work in tears, afraid for her safety, afraid to be alone and that she seriously feared for her
daughter's welfare.
[7] In Jane Doe A's interview memorandum, she stated that the conduct "was horrible," she "would
cry constantly," and she was "terrified that [Vallee] would post the nude photographs of her and
provide them to others."   Furthermore, she was unable to use social media all through high
school and college, and she was permanently locked out of several of her accounts.  Jane Doe D
stated that she was "an emotional wreck."  She would "cry for days" and "questioned what she
had done to deserve this."  The events caused her to "become depressed."  She had to change her
various online accounts, close accounts altogether and discontinue using them, and she
purchased a new computer.   Another Jane Doe stated that she was "upset and scared" and was
"literally sick to her stomach" because she was afraid that Valle would show up at her home.
She could not sleep and was afraid to be in her home alone.   Another Jane Doe stated that she
"would call her mother crying from the messages she was getting."  She stated that she "felt

sexually explicit photographs of themselves (many taken when they were only 15 or 16 years old), as well as their personal information, distributed all over the internet, sent to their friends and family and teachers.  These Jane Does feared for their personal relationships, their relationships with their teachers and family members, and their ties to their community.  And indeed, for many victims, Vallee made their nightmares come true, as he carried through with his threats and sent their photographs around and posted them on Facebook.  These girls, who were already at an especially vulnerable time of their lives, had to show up at school every day in their small town, knowing that sexually explicit photographs of them (often with their faces visible) had been distributed to their classmates, friends, siblings, and other family members.  For these victims, the damaging effects that Vallee caused them will last for many years to come.  Indeed, they will never be free from Vallee's crimes.  Rather, they have to live with the fact that sexually explicit images of them are forever out there in the public domain, possibly being consumed by other sexual predators.

To make matters worse, these teenaged girls did not know how to end Vallee's hacking and cyberstalking campaign.  For months and, for some for years, on end, Vallee continued with his online sexual assault, as his victims were trapped in their own private purgatory, too embarrassed to tell others.  Eventually two dozen teenaged victims found the courage to tell their parents, and then the police, about their tormentor.  Still other victims, whose identities are

---

hopeless and that no one could help her."  She felt that "James" was "following her no matter where she went," that she "did not feel safe in her own home," and that she would "cry every night" and kept asking herself, "Why me?"  Jane Doe H, in her memorandum of interview, stated that the events "were awful," that she "became anxious all the time."  Jane Doe B revealed that she was afraid that "Seth" would follow her to college, would hack into her college e-mail accounts, and would humiliate her at her new school.  She said she felt "violated" and "angered" by his sexual demands.  Jane Doe C was convinced that "Seth" was physically surveilling her and feared for her safety.  As she stated in her interview memorandum, she felt "lost, afraid, scared for her life, and afraid to be alone."

known to law enforcement, have chosen not to come forward at this time.  It is likely that there are other equally traumatized victims whose identities are still unknown to law enforcement.

Significantly, Vallee was fully aware of the devastating impact his conduct would and did have on his victims.  In his own words, Valle knew that he would "ruin their lives" if he sent their photographs to others.  Indeed, he tried to exploit that fact.  As he put it succinctly to Jane Doe J when he threatened to distribute a semi-nude photograph of her, "just show me your tits and your life won't have to get ruined . . . . just get nakedddd [sic].  There's no need to let your life be destroyed when you can save everything by letting me check out your nips."  (Second Superseding Indictment ¶ 74).   Yet knowing full well that he would "ruin [his victims'] lives," that is exactly what he did.

## IV.    Vallee's Post-Arrest Conduct While Under Pretrial Supervision

### A.  Continuing to Hack and Cyberstalk Victims and Violate Other Terms of Supervision

Vallee is incorrigible.  Despite his multiple arrests and multiple impositions of pretrial supervision in this case, Vallee brazenly continued hacking and cyberstalking, communicated with potential witnesses, possessed and used a cell phone, and accessed the internet without supervision, all in violation of his conditions of pretrial release.[8]  Vallee's bail was ultimately

---

[8] In doing so, Vallee violated a number of his conditions of pretrial supervision.  Both the October 24, 2013, Order (Dckt #6 in United States v. Vallee, 1:13-mj-00112-DL-1) and the July 16, 2015, Order (Dckt #9 in United States v. Vallee, 1:15-cr-00115-PB-1) setting Vallee's conditions of release prohibited him from, among other things, continuing to violate the law and directed him to "avoid all contact, directly or indirectly, with any persons who are or who may become a victim or potential witness in the subject investigation or prosecution."   (See Order Para. 1, 8(l))  (Jane Doe K and Jane Doe J's names had been provided to defense counsel in discovery).   Both orders prohibited Vallee from possessing or using a computer or any internet capable device and was prohibited from accessing the internet without either parental supervision (in the October 2013 order) or the approval of both his parent and his supervising officer (in the December 2015 order).  (Order Para. 9(a)).

revoked as a result, and that conduct gave rise to new charges in a second superseding indictment filed in July 2016.   It is clear that Vallee would still be hacking and cyberstalking his victims (not to mention seeking out and collecting child pornography) if he were not in custody today.

Indeed, just hours before his initial October 2013 arrest, Vallee was hacking and sextorting two of his victims, Jane Doe J and Jane Doe K.   Undeterred, in November through December 2013, post-arrest and while under pretrial supervision, Vallee was again hacking and sextorting these very same two victims.[9]  Likewise, Vallee's subsequent arrests and terms of pretrial supervision did not deter him.  In July 2015, Vallee was then indicted and placed on a second term of pretrial supervision.  He was then charged with additional crimes on February 10, 2106, in a first superseding indictment.  On February 12, 2016, *two days later,* Vallee again hacked and cyberstalked these *very same two victims.*  Vallee continued hacking and cyberstalking his victims until March 16, 2016, when he was arrested again on still more charges.  (Second Superseding Indictment ¶¶ 73, 77-78, 79).  This was only weeks before Vallee was scheduled to begin trial.

**B.  Seeking Out and Collecting Images of Prepubescent "Hard Core" Child Pornography**

While under pretrial supervision, Vallee repeatedly searched the internet for, and ultimately collected, images of child pornography, with a focus on "hard core" images of "preteens," "little girls," "toddlers."  Although child pornography charges are not part of the current prosecution and plea agreement, as set forth below in describing Vallee's characteristics and the need for deterrence, Vallee's behavior is nevertheless relevant.  Indeed, Vallee has

---

[9] The government dismissed the original complaint on December 16, 2013, and accordingly, Vallee's pretrial supervision ended at that time.

submitted psychiatric evaluations that address the child pornography evidence uncovered in this investigation.

For example, using his illicit hidden smart phone, on June 11, 2015, Vallee performed searches on "Bing" for a number of suspect terms, including "VK+ Toddler + Fuck," "pthc bj jb," "pthc mask," "baby j sex," "underage slut" and "sexy preteen."   "VK" is a Russian-language social networking website, "pthc" is a well known acronym for "pre- teen hard core," "bj" is believed to refer to oral sex, and "jb" likely refers to "jail bait."   Tellingly, on the same date, interspersed with these child pornography searches, Vallee searched for terms such as "probation officer cost me my job" and "*fuck the system*."   Several months later, on November 12, 2015, Vallee performed "Bing" searches for other suspect terms, including "daughter forced to fuck," interspersed with the terms "*I don't want to go to prison*" and "*your laws mean nothing to me*" on the same date.   The very next day, Vallee searched terms like "15 yo slut jailbait," "15 yo slut," "13 yo slut," "13 yo slut selfie" "kid with cum on face," "preteen cum of face," "preteen facial," "preteen pthc facial," and "14 yo fucked pthc."   On November 29-30, 2015, Vallee clicked on an article for "child porn photos traded on facebook in plain sight," and conducted Bing searches for terms like "pthc preteen porn,"  "teenie little girls stickam," "young stickam captures," "stickcam + bate," and "preteen pthc webcam bate."   "Stickam" is a social media/photograph sharing website.   As discussed below, on these same dates, Vallee began concocting a plan to flee and live as a fugitive.

Vallee also appears to have collected several images of child pornography.   Agents found such images on his illicit cell phone.   A summary of the forensic examination of Vallee's hidden cell phone in included as Exhibit A.

**C.  Concocting a Plan to Flee**

While he was under pretrial supervision, Vallee apparently devised a strategy for fleeing from law enforcement.  For example, his hidden smart phone showed contained search queries made on November 30, 2015, for the following:  "*tips for a fugitive in winter*," "*being a fugitive in the winter*," and "*how long after sentencing do you go to jail*."  Tellingly, Vallee conducted these searches hours after searching for child pornography, as described above.   The next day, December 1, 2015, Vallee conducted a search for "*I refuse to go to jail*."  Two days later, on December 3, 2015, he searched child pornography, as described above.

### D.  Resisting Arrest and Engaging in a High Speed Chase With Marked Police Cruiser in Pursuit

At about noon on March 16, 2016, USSS agents, having requested assistance from local law enforcement, attempted to arrest Vallee during a vehicle stop at an intersection near a Walmart store in Gilford, New Hampshire.  Vallee ignored USSS agents' commands to turn off and exit his vehicle and instead engaged in a high speed chase.  He traveled for several minutes at 50-60 miles per hour in 30-35 mile per hour zones, crossing double yellow lines on multiple occasions, all the while with a marked Gilford Police patrol car (with its siren and emergency lights activated) in pursuit.   Specifically, as set forth in the police report prepared by Officer Curtis Mailloux of the Gilford Police Department (and corroborated by a corresponding police dispatch call log), Officer Mailloux was driving a marked patrol vehicle with its emergency lights activated, when he pulled his patrol car up to Vallee's vehicle to assist USSS agents.  He saw USSS agents exit their Suburban with their firearms drawn, approach Vallee's car, and repeatedly instruct Vallee to turn off and exit his car.  According to Officer Mailloux, Vallee instead accelerated and took off at a high rate of speed.  Officer Mailloux then ran to his patrol car, did a U-Turn and pursued Vallee's vehicle, traveling 50-60 miles per hour for several minutes.   (There were three posted speed limit signs along Vallee's route:  one for 30 miles per

hour and two for 35 miles per hour.)  During the pursuit, according to Mailloux, Vallee crossed the double yellow line several times in an attempt to pass other cars traveling in his same direction.  As he did so, Vallee almost collided with other cars who were traveling in the opposite direction.   Eventually, Vallee pulled off the main road into a condominium development parking lot, which led toward a dead end.  At the dead end, Vallee eventually got out of his car, and police handcuffed and arrested him.   The Gilford Police Department's dispatch call log corroborates this, indicating that the Officer Mailloux initially arrived at the attempted traffic stop at 11:52 a.m., entered the condominium development at 11:54 a.m., and Vallee was not in custody until 11:58 a.m.  (See Mailloux Police Report and BPD Call Log, Exhibits B & C).  According to Google maps, Vallee drove for approximately 1.7 miles during the chase.

### E.  Vallee's U.S. Sentencing Guidelines Calculation

The government agrees with the Guideline Calculations as set forth in the PSI, which calculates Vallee's total adjusted offense level at 26 (PSI ¶128), plus a two-year mandatory minimum for Count 23 (the aggravated identity theft count charging Vallee with violating 18 U.S.C. 1028A), for a total guideline imprisonment range of 87 to 102 months.  (PSI ¶148). Specifically, because the 18 U.S.C. § 2261A cyberstalking charge (Count 31) has the highest guidelines, it drives Vallee's total offense level.  The base offense level for that charge is 18, pursuant to U.S.S.G. § 2A6.2.  The government believes that a two-level adjustment under U.S.S.G. § 2A6.2(b)(1)(D) is appropriate because Vallee engaged in a "pattern of activity involving stalking, threatening, harassing, or assaulting the same victim."  As set forth in the indictment, from 2012-2016, Vallee repeatedly hacked Jane Doe J's online accounts, and he sent

her multiple sextortionate electronic threats.  (See Second Superseding Indictment ¶¶ 10, 72-78, 84).

Furthermore, the government believes that a two-level adjust under U.S.S.G. §3A1.1 is appropriate because Vallee targeted vulnerable victims.  USSG § 3A1.1(b)(1) provides for a two-level adjustment "if the defendant knew or should have known that a victim of the offense was a vulnerable victim."   The guidelines commentary defines "vulnerable victim" to include someone who is "unusually vulnerable due to age . . . or otherwise particularly susceptible to the criminal conduct." Commentary, Application Note 2(B).   Here, as set forth in the indictment, Vallee knowingly targeted girls who were 15-17 years old (a handful were 18).  Notably, many were much younger when Vallee initially targeted them.  For example, Jane Doe M was in middle school when she met Vallee online.

Vallee clearly knew the young ages of his victims, as he personally knew virtually all of his victims.  These teenaged girls were at an especially vulnerable period in their lives, many just starting high school.   Because they were so young, they were more likely to be terrorized by Vallee's threats and succumb to Vallee's sextortionate demands.  Furthermore, because of their age, they were less likely to understand that "Seth" was committing a crime, figure out who "Seth" really was, and report his conduct to the authorities.  And Vallee was fully aware of their vulnerable nature.  Many of the victims expressed their terror to "Seth."  And indeed, as predicted, they were much less likely to detect and report Vallee's criminal conduct.  They had been hacked and sextorted for many, many months (and in some cases years) before they finally came forward to notify their parents and/or the police.  Many most likely never came forward.

Significantly, Vallee *exclusively* targeted young victims for his hacking and sextortion scheme.  Admittedly, an enhancement would not be appropriate if, for example, Vallee had

primarily targeted adult women but, unbeknownst to Vallee, a few of his victims happened to be minors.  Nor is the government suggesting that the victims here are vulnerable based solely on their age or membership in a particular class of individuals.  Rather, the vulnerable victim enhancement applies because Vallee selected his victims due to their perceived vulnerability to the offenses---he knew they would be much more likely to capitulate to his sextortionate demands, would be too unsophisticated to figure out who "Seth" really was and that he was committing crimes, and, in any case, would be too afraid to report him to the authorities.  Interestingly, and supportive of the position that he selected his victims for the reasons set out above, although Vallee collected sexually explicit images of adult females, he never tried to force an adult female to give him sexually explicit photographs of herself.  Instead, he purposefully saved his criminal hacking and coercive tactics exclusively for teenaged girls, and he did so because of their perceived vulnerability.

In addition, the government submits that a two-level adjustment under U.S.S.G. § 3C1.2 is appropriate because Vallee recklessly endangered others during flight.  U.S.S.G. § 3C1.2 provides for an adjustment "if the defendant recklessly created a substantial risk of death or serious bodily injury to another person in the course of fleeing from a law enforcement officer."  Here, as described above, on March 16, 2016, when federal and local law enforcement officers were attempting to effectuate a car stop in order to arrest Vallee, Vallee remained in his car, refused their command to turn off his vehicle, and instead sped away.  He proceeded to go on a several-minute high-speed chase, crossing the double yellow lines several times, swerving in and out of traffic, through streets of small towns.  He did this with a marked Gilford Police Department patrol car in pursuit, with its sirens and flashing lights activated.   He eventually

surrendered but only when he drove into a condominium development parking lot from which he had no way to escape.

In order to determine Vallee's combined offense level, the government concurs with Probation that a five-level increase under U.S.S.G. § 3D1.4 is appropriate because Vallee's multiple charges do not group. As provided in U.S.S.G. § 3D1.2(d), the multiple charges under § 1030(a)(7) (which falls under U.S.S.G. § 2B3.2), § 875(d) (which falls under U.S.S.G. § 2B3.3.), and § 2261A (which falls under U.S.S.G. § 2A6.2) do not group. These types of charges are "specifically excluded" from the grouping section. Here, the 31-count superseding indictment contains distinct criminal charges that involve nine different Jane Doe victims. Thus, when determining Vallee's combined offense level under U.S.S.G. § 3D1.4, since the number of units exceeds five, five levels are added to the offense level. This brings Vallee's highest combined offense level from 26 to 31.

The government agrees that a three-level reduction from the combined offense level of 31 is appropriate for acceptance of responsibility, despite the fact that Vallee waited until August 15, 2016, to sign a plea agreement, shortly before his September 7 trial date. It bears noting that, at that point, the government had completed almost all of its trial preparation. For example, the government had already re-interviewed all of the victim witnesses; selected, marked, and boxed almost 400 exhibits; and drafted its trial brief, motions *in limine*, exhibit list, proposed stipulations, proposed jury instructions, and proposed *voir dire*. Furthermore, Vallee allowed this case to drag on for many years, insisting all the while that he was going to trial and despite multiple overtures from the government to resolve the case. He was originally charged by complaint in October 2013 and initially indicted in July 2015. Discovery was completed long ago, and the government gave Vallee a multi-hour reverse proffer over a year ago. Instead,

Vallee took this case to the brink of trial on several occasions before moving for various continuances. Nevertheless, the government does not object to a three-level reduction for timely acceptance.

As part of its plea agreement, the government agreed to recommend a sentence of not more than eight years (96 months), which is within the Guidelines range as computed by both Probation and the government.

### F. The 3553 Factors Do Not Support a Downward Variance or Departure But Do Support a 96-Month Sentence

#### 1.    Nature and Circumstances of the Offense

Vallee's criminal conduct was extremely pernicious. In essence, Vallee attempted to commit sexual assault by proxy. Even though Vallee was not physically present in the room when he was coercing his victims to "get fucking naked" and "finger yourself" and the like, to them, it was precisely the same thing. Vallee repeatedly reached out, through his computer, to try to force his victims to strip and masturbate for him. He craved to exert power and control over his victims and to terrorize them all the while. Vallee had collected a large trove of adult pornography from various adult-entertainment websites. But he did not stop at amassing consensually-created and consensually-distributed adult pornography. Instead, he stole private, sexually explicit images of teenaged girls he knew by hacking into their online accounts. But Vallee did not stop at stealing photographs either. What Vallee thrived on was *forcing* these girls to create pornography of themselves against their will and for his sole benefit. So month after month, year after year, Vallee tried to remotely sexually assault dozens of girls.

Ultimately, Vallee's criminal conduct was, at its core, a form of sexual coercion and violence. Indeed, in a recent Brookings Institution report, "sextortion" is described as "serial online sexual abuse . . . akin to virtual sexual assault." See "Sextortion: Cybersecurity,

teenagers, and remote sexual assault," by Benjamin Wittes, et al.  Center for Technology
Innovation at Brookings, May 2016, at p. 2.   With sextortion crimes, the attacker "effectively
invades the homes of sometimes large numbers of remote victims and demands the production of
sexual activity from them.  Sextortion cases involves what are effectively online, remote sexual
assaults . . . ."  (Id. at p. 3).   The authors liken sextortion to a "species of violence against
women."  (Id. at p. 4).   In the authors' words, "Sextortion is brutal . . .  a form of sexual
exploitation, coercion, and violence . . . . "  (Id. at p. 5).    "And the impacts on victims can be
severe and likely lasting."  (Id. at p. 5).

       There are several aspects of Vallee's particular brand of sextortion that are especially
troubling, including (1) its duration and persistence, continuing post-arrest and while under
pretrial supervision, (2) the number and vulnerable ages of his victims, and (3) the fact that
Vallee actually carried out his threats and distributed the girls' sexually explicit photographs to
others.  As described above, Vallee sextorted dozens and dozens of vulnerable teenaged girls
over the course of almost six years.  He was persistent and prolific.  Vallee peppered many of his
victims with multiple text and Facebook messages a day, day after day, for months on end.
Vallee continued hacking one victim's account (Jane Doe K's) and stalking another victim (Jane
Doe J) over the course of *four years*.   This was not a one-time slip in judgment.  Nor was it a
single-victim obsession.  To make matters worse, Vallee took advantage of a girls he knew
personally.  The two victims that Vallee targeted the most aggressively and for the longest period
of time, Jane Doe E and Jane Doe H, considered him to be their friend.  One even confided in
him about her unknown stalker.

       Moreover, Vallee brazenly continued hacking and sextorting his victims, even after he
was arrested and was under pretrial supervision.  He flagrantly violated the terms of his

supervision and did so while he was having many ongoing contacts with law enforcement officers, pretrial services officers, prosecutors, and the Court. During the three-year lifespan of this prosecution, Vallee has had multiple arrests, arraignments, initial appearances, conditions of pretrial supervisions, and the like. Yet despite all of these contacts with officers of the Court, Vallee continued to hack and sextort his victims. Indeed, he was hacking and sextorting up until March 16, 2016, a few weeks before his trial was scheduled to begin. During that time, Vallee also acquired an illicit smart phone, loaded sexually explicit images of his victims (not to mention images of child pornography) on it, and devised his plan to flee and to live as a fugitive.

Vallee also callously and repeatedly carried through with his threats to distribute his victims' sexually explicit photographs. Vallee did not stop at stealing and hording the girls' sexually explicit photographs. He did not stop at using the girls' photographs as weapons to extort still more photographs. That conduct alone would have supported the very same charges that are contained in the superseding indictment. But Vallee took his criminal conduct even further. Time and time again, Vallee carried through with his threats and sent the girls' sexually explicit photographs to their classmates, their friends, their family members, and, in at least one instance, he published them widely on the internet by posting them on a fake Facebook profile he created in her misspelled name. Vallee distributed six different identified Jane Doe victims' fully and semi-nude photographs to others, including to almost a dozen other teenaged girls who were the victims' friends/classmates. Vallee ultimately distributed almost 100 unique images. These included several extremely sexually graphic photographs, showing the girls' exposed genitals. Such images could, under certain circumstances, support charges of trafficking in child pornography.

These factors support a 96-month sentence.  See, e.g., United States v. Moon, 513 F.3d
527, 534 (6th Cir. 2008); United States v. Gonzalez, 541 F.3d 1250, 1254 (11th Cir. 2008).  Cf.
18 U.S.C. 3553(a)(2).

### 2.  Defendant's History and Characteristics and His Disturbing Post-Arrest Conduct

Vallee is a 23-year-old male who, until his incarceration, lived with his mother while he
worked at various nearby stores.  He has no known criminal history.   He grew up in a stable
family environment, and he has a high school degree and sophisticated computer skills.

The government is mindful that Vallee was relatively young when he initially began his
sextortion campaign.  It is for this reason that the government is seeking a within-Guideline's
sentence rather than an upward variance or upward departure.  It bears noting that Vallee
continued to engage in these crimes over the course of several years, well into his adult years.
And, despite his age, Vallee clearly understood all the while that he was committing serious
crimes and that, if caught, he would go to prison.  He admitted as much to his victims when they
threatened to report him to the police.  Indeed, in March 2016, when Vallee was communicating
online with an undercover agent who he believed was one of his victims, Vallee admitted that
she could "have [him] arrested" and told her that he was afraid it was a "set up," asked her to
prove she was not "having the cops look at this right now," and told her "I just don't trust you
not to have me arrested . . . ."  Vallee was also quite sophisticated.  He went to extraordinary
lengths to try to hide his identity, using hidden devices, spoofed text accounts, and open wifi
connections.

Issues raised by the defendant under seal are addressed in a (sealed) Addendum, to be
filed under seal concurrently with this memorandum.

### H.  Just punishment, respect for law, deterrence, and public protection

A 96-month sentence would provide just punishment and promote respect for the law. For years Vallee demonstrated little regard for the law and other individuals, especially young females.  He continued hacking and cyberstalking victims over the course of almost six years, knowing full well that he was violating the law and would be sent to prison if caught.  Indeed, Vallee fully admitted his complete lack of respect for the law.  He mocked it, repeatedly bragging to his victims that law enforcement would never find him and devising an elaborate escape plan to live in the wilderness as a fugitive.  Furthermore, a 96-month sentence is needed to deter, and protect the public from, Vallee.  Vallee is out of control.  He kept hacking and cyberstalking victims even after he had been arrested, was under pretrial supervision, was having multiple interactions with officers of the Court, and was only weeks away from trial.  Vallee's conduct has made it clear that nothing short of incarceration will deter Vallee and protect the public from him.

A significant sentence is also needed to protect the public from other would-be "sextortionists" who are contemplating such crimes.  These cyber predators presumably already realize that, because they are hiding behind their computers, it is much less likely that they will be detected than if, for example, they committed a hands-on offense.   They may also mistakenly believe that "sextortion" is not a serious crime---that it is more akin to "texting gone awry."  If, on top of this, these cyber criminals realize that the punishment that is ultimately meted out is fairly mild, then there is a serious risk that they will do a "cost-benefit" analysis and continue their crimes unabated.  So a significant prison sentence is needed to send a message to other hacker-cyberstalkers.  As one District Judge stated in another hacking case:

> [C]ybercrimes by their very nature allow offenders to commit the offenses without leaving their homes and with a veil of anonymity.  This lack of contact with the victims of their crimes and insulation from law enforcement may cause them to be under-

deterred.  Only successful prosecution and significant punishment will supply prospective cyber-criminals with the information needed to create real deterrence.

*United States v. Watt*, 707 F.Supp.2d 149, 156-57 (D. Mass. 2010) (citations omitted).

Moreover, a 96-month sentence is in line with other sentences handed down in similar "sextortion" prosecutions around the country.   For example, in 2010, Garret Roegner, 25, was sentenced to 78 months in prison for attempting to sextort a former girlfriend by threatening to post on the internet sexually explicit photographs of her, including photographs taken when she was a minor engaging in sexual activity with the defendant.   *United States v. Roegner* (N.D. Iowa, 6:10-cr-244).  In 2012, 35-year-old Christopher Chaney was sentenced to an above-Guideline's 120 months for hacking into and stealing photographs from the email accounts of over 50 people (including celebrities) and, without making threats, distributing a small number of the stolen photographs.  (Chaney did not himself post the photographs to the internet). Chaney's Guidelines recommendation was 57-71 months.  *United States v. Chaney* (C. D. Cal. 2012, 2:11-cr-00958).  On March 1, 2016, 31-year-old Michael Rubens was sentenced to an above-guidelines 120 months in prison for hacking into the online accounts of dozens of adult women during a period of three years, stealing photographs, and posting those photographs on a revenge porn website.  Rubens' calculated Guidelines range was 41-51 months, with an additional 24 months for an identity theft charge.  *United States v. Rubens* (N.D. Fla. 2015, 4:15-cr-00033).  In 2013, 27-year-old Karen Kazaryan was sentenced to an above-Guideline's 60 months for hacking into hundreds of email accounts in search of sexually explicit photographs and extorting victims for more.  The government calculated his Guideline at 36-42 months. *United States v. Kazaryan* (C. D. Cal. 2013, 2:13-cr-56).  In 2011, 32-year-old Luis Mijangos, a paraplegic, was sentenced to an above-Guideline's 72 months for hacking hundreds of victims' computers, turning on the webcams, obtaining sensitive images, and extorting victims for more

photographs.  The government-calculated Guideline range was 36-42 months.  *United States v. Mijangos* (C.D. Cal. 2011, 2:10-cr-743).[10]

On March 21, 2016, Michael Ford, 36, was sentenced to 57 months for hacking into hundreds of adult females' online accounts and sending sextortionate messages to 75 of them, threatening to distribute photographs of them unless they took voyeuristic videos of other women in changing room.  His calculated guideline's range was 51-63 months.  *United States v. Ford*, (N.D. Ga. 2015, 1:15-cr-319-ELR).[11]  And in this District, in 2013, 23-year-old John Bryan Villegas was sentenced to 33 months in prison for obtaining stolen sexually explicit photographs of a single adult female and trying to extort her for more photographs.  *United States v. Villegas*, (D. NH 2013, 1:13-cr-00075-JL).

The cases Vallee references in his sentencing memorandum do not support the 48-month sentence that he seeks.  For starters, the applicable guideline's ranges for those other defendants were typically much lower than Vallee's.  Further, none of those defendants continued committing crimes post-arrest and while under pretrial supervision, none took officers on a high speed chase to evade arrest, and only one stole money out of victims' online accounts.  Few targeted minors and carried through with their threats to distribute photographs, and even then, they only did so in a limited fashion.  For example, in *United States v. Abrahams,* (18 months), Abrahams, who was 19 at the time he was sentenced, was not charged with Section 2261A or

---

[10] *U.S. v. Mijangos* does not help Vallee.  Mijangos was not charged with Section 2261A or 1028A.  Furthermore, there was a factual dispute about whether Mijangos ever carried through with his threats.  At most, he published photographs of a single victim.

[11] *U.S. v. Ford* doesn't help Vallee.  Unlike Vallee, Ford's sextortion victims were all adults.  And Ford was given that District's customary "fourth point" for (extremely) early acceptance of responsibility.  Nor was Ford charged with Section 1028A, which carries a two-year mandatory minimum.  Moreover, Ford carried through on his threats and actually distributed the sextortionate photographs on only two identified occasions, and even then, he sent them to targeted recipients and never published them on the internet.

1028A.  He hacked and sextorted 12 young women (described in the plea agreement as in their

"late teens or early twenties") and published sextortionate photographs on only a few occasions.

Abrahams' guideline's range was 12-18 months as calculated by Probation and 21-27 months as

calculated by the government.  *United States v. Khan,* (30 months), did not involve sextortion at

all.  Khan, who pleaded guilty to one count of 875(c), had a guideline's range of 24-30 months.

As a college student, Khan sent harassing emails and text messages to a single victim, his ex-

girlfriend (also a college student), threatening to kill her and himself.   In *United States v.*

*Savader*, (30 months), Savader, who was 21 when he was sentenced, targeted only adult victims

(15 total) and never carried through with his threats to distribute the sextortionate photographs.

Savader's guidelines range was 41-51 months, as calculated by Probation and 24-30 months as

agreed in the plea agreement.  In *United States v. Jentsch* (60 months), Jentsch, age 25, targeted

a single adult victim and pleaded guilty to Section 2261A and 2261(b)(6) (attempted production

of child pornography).  He sent his victim's naked photographs (taken when she was a minor) to

specific people and posted them on a fake Facebook profile.  In many ways, Jentsch's conduct

was similar to Vallee's conduct toward but one of his many victims, Jane Doe H.  Indeed, a five-

year sentence could be appropriate had Vallee's only targeted one single victim, Jane Doe H.  In

advocating for a four-year sentence, Vallee would essentially have this Court ignore the crimes

Vallee committed against his many other victims.

Ultimately, as set forth above, in general, courts have repeatedly imposed significant

sentences in "sextortion" cases where, as with Vallee, they involved multiple victims, young

victims, and where the defendant carried through with his threats and distributed and/or posted

online the victims' sexually explicit photographs.  Therefore, in order to minimize the sentencing

disparity among similarly situated defendants, a 96-month sentence would be appropriate in this case.

**<u>Conclusion</u>**

A significant period of incarceration is necessary in light of the nature of Vallee's offense, including the extensive victimization of young victims and the depth of harm he inflicted on them. A lengthy prison sentence is also necessary to promote respect for the law as well as to deter and protect the public from a seemingly-incorrigible defendant. A 96-month sentence, moreover, is not greater than necessary and would not result in an unwarranted sentencing disparity among similarly situated defendants. It is also within the agreed upon four-to-eight year binding range set forth in the Vallee's plea agreement and is within the sentencing guideline's range as calculated by the PSI.

Accordingly, the government respectfully submits that a 96-month period of incarceration is appropriate, and, for the reasons set out above, is necessary.

January 31, 2017

<div style="margin-left:40%">

Respectfully submitted,

EMILY GRAY RICE
United States Attorney

By: <u>/s/ Arnold H. Huftalen</u>
Arnold H. Huftalen
Assistant U.S. Attorney
53 Pleasant St., 4th Floor
Concord, NH 03301
(603) 225-1552
NH Bar #1215
arnold.huftalen@usdoj.gov

<u>/s/ Mona Sedky</u>
Mona Sedky
Senior Trial Attorney
U.S. Dept. of Justice, Crim. Div.

</div>

950 Pennsylvania Ave. NW
Washington, DC 20530
(202) 353-4304
DC Bar #447968
mona.sedky@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

     I certify that a copy of this Consolidated Objection and Memorandum, sealed Addendum, and Exhibits A & B, have been served upon defense counsel, Jonathan Saxe, via ECF filing notice this date.

<u>/s/ Arnold H. Huftalen</u>
Arnold H. Huftalen
Assistant U.S. Attorney